UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | | |
|---|---|---|
| ANDREW JOHN MILLER, | ) | |
| # 407359, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:12-cv-117 |
| | ) | |
| v. | ) | Honorable Robert Holmes Bell |
| | ) | |
| DUNCAN MACLAREN, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## **REPORT AND RECOMMENDATION**

This is a habeas corpus proceeding brought by a state prisoner, through counsel, pursuant to 28 U.S.C. § 2254.  Petitioner's criminal convictions stem from an August 31, 2000, home invasion, the murders of Marinus and Sary Polderman and their daughter, Anna Lewis, and the perjury that petitioner committed during the course of the murder investigation.

On May 22, 2008, a Kalamazoo County Circuit Court jury found petitioner guilty of three counts of felony murder, Mich. Comp. Laws § 750.316(1)(b); one count of perjury, Mich. Comp. Laws §  767A.9(1)(b); and one count of first-degree home invasion, Mich. Comp. Laws § 750.110a(2).  On June 30, 2008, petitioner was sentenced as an habitual offender, third offense, Mich. Comp. Laws § 769.11, to life imprisonment without parole on each of the three felony murder convictions, 127 months to forty years' imprisonment on his perjury conviction, and 210 months to forty years' imprisonment on his first-degree home invasion conviction.  After unsuccessful attempts to overturn his

convictions in state court, petitioner filed this habeas corpus petition.  Petitioner seeks

federal habeas corpus relief on grounds rejected by the Michigan Court of Appeals:

> I.   Petitioner's right to confront witness Angela McConnell was violated where he did not have an opportunity to cross-examine her after she withdrew her agreement to testify and recanted her story but the people were still allowed to introduce her preliminary examination testimony.
>
> II.  Petitioner's statements to law enforcement should not have been admitted where the statements were obtained in violation of his due process rights (Police Misconduct).
>
> III. Petitioner's convictions should be overturned where there was insufficient evidence to convict him of the crimes charged.

(Petition at 5-6, ECF No. 1, PageID.4-5).  Respondent argues that the petition should

be denied for lack of merit.  (Answer at 30-49, ECF No. 11, PageID.238-57).

Judge Bell has referred the matter to me for all purposes, including the issuance

of a report and recommendation under 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the

Rules Governing Section 2254 Cases in the District Courts.  After review of the state-

court record, I conclude petitioner has not established grounds for federal habeas

corpus relief.  Petitioner has not shown that the state court decisions rejecting the

grounds raised in the petition "were contrary to, or involved an unreasonable

application of clearly established Federal law, as determined by the Supreme Court of

the United States" or were  "based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding[s]."  28 U.S.C. § 2254(d).

I recommend that the petition be denied on the merits.

**Standard of Review**

The Court's review of this petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). "State-court factual findings [] are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 562 U.S. 115, 121 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)). AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012) (*per curiam*).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Id.* at 102-03 (citation and internal quotation omitted); *see Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see White v. Wheeler*, 136 S. Ct. 456, 460 (2015); *Davis v. Ayala*, 135 S. Ct. at 2198; *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

The only definitive source of clearly established federal law for purposes of § 2254(d)(1) is the holdings—not dicta—of Supreme Court decisions. *White v. Woodall*, 134 S. Ct. at 1702; *see Woods v. Donald*, 135 S. Ct. at 1377 ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court."). "[W]here the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *Id.* (quotations and internal citations omitted).

An unreasonable application of the Supreme Court's holding must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)). Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. at 1702 (quoting *Harrington v. Richter*, 562 U.S. at 103). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' " and "[i]t therefore cannot form the basis for habeas relief under AEDPA." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (quoting *Parker v. Matthews*, 132 S. Ct. at 2155); *see Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (*per curiam*) ("As we have repeatedly emphasized, [] circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'").

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Section 2254 (d)(2) requires that this Court accord the state trial court substantial deference. If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination. *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

## Proposed Findings of Fact

### A.    Circuit Court Proceedings

On February 22 and 28, 2008, Judge Pamela Lightvoet conducted a hearing on petitioner's motion to suppress statements that he had provided to the police on March 13, 14, and 15, 2007. (Hearing Transcripts (HT I and HT II), ECF No. 14, 15). On the initial day of the hearing Judge Lightvoet heard testimony from witnesses and received a number of exhibits, including a video recording and a written statement that petitioner had signed on March 13, 2007. (HT I, ECF No. 14).

On the second day of the hearing, Judge Lightvoet heard the attorneys' arguments and made her ruling denying petitioner's motion to suppress. (HT II, ECF No. 15). Judge Lightvoet found that petitioner's statements were voluntary. She rejected petitioner's argument that his statements were involuntary because he was experiencing withdrawal symptoms. (HT II 24-27). The video and audio portions of the recording showed that petitioner "was not going through any level of withdrawals such that the interview should have been stopped. He seemed to answer questions appropriately. He was offered time and time again beverages. He was provided with pizza at one point. He was provided with cigarettes on numerous occasions. It was made clear that he could leave anytime he wanted to leave and there is no evidence that he was in custody so he is not entitled to be given his *Miranda* rights. And that is not in dispute, the fact at least that he was not in custody." (HT II, 25). Petitioner was told "over and over again that he could leave." (HT II, 26).

Petitioner "came in willingly three days in a row, [March] 13th, 14th, and 15th." (HT II, 26).  The interviews were not unduly lengthy.  The March 13, 2007, interview was the longest interview at nine or ten hours, but petitioner was afforded breaks.  The shortest was the one-half hour interview on March 14th.  The interview on March 15th consisted of two parts.  Petitioner initially spoke to the police and then left the police station.  Later that day petitioner was arrested on a firearms charge, read his *Miranda* rights, he and "continued to talk to investigators on his own."  (HT II, 26).  The timing of petitioner's arrest did not undermine the voluntariness of petitioner's statements. (HT II, 25).  Petitioner's age and educational level did not undermine the voluntariness of his statements.  "He had gone through the system before, he was working and it appears as though – answered the questions and [was] an educated gentleman."  (HT II, 27).  Petitioner was not deprived of food or sleep.  He was not physically abused. Judge Lightvoet found that petitioner voluntarily came to the police station, "but more importantly, that the statements given were voluntary under the circumstances and given the totality of the circumstances in this case."  (HT II, 27).

Petitioner's trial began on May 14, 2008, and it concluded with the jury's verdict on May 22, 2008, finding petitioner guilty of three counts of first-degree felony murder, one count of perjury, and one count of first-degree home invasion.  (Trial Transcripts (TT I-TT VI), ECF No. 16-21).

It was stipulated that Marinus Polderman, Sary Polderman, and Anna Lewis were murdered on August 31, 2000, at the Poldermans' residence in Kalamazoo County, Michigan.  (TT VI, 1029).

Fred Lewis testified that Anna Lewis had been his wife, Marinus Polderman had been his father-in-law, and Sary Polderman had been his mother-in law. (TT II, 397). Anna Lewis was 63 on the date she was murdered. Marinus was 93 and Sary was 91. (TT II, 399). The members of the family lived close to the Poldermans and were trying to allow the elderly couple to maintain their independence and live in their own home for as long as possible. Fred and Anna Lewis lived in an adjoining neighborhood. Anna's son, Tom Gibson, and Tom's wife Teresa lived even closer. (TT II, 398-99).

On August 31, 2000, Fred Lewis and his stepson, Tom Gibson, had plans to go bowling together. It was the start of the bowling season and they were on a bowling team. Fred's plan was to come home from work and pick up Tom around 5:50 p.m. On the drive home from work, Fred saw his wife's van parked at her parents' house and he decided to stop in and say hello. He found that the doors to the house were locked and he was unable to get a response from anyone inside. Tom Gibson lived nearby, and Fred Lewis went and retrieved him to see if they could figure out what was wrong. (TT II, 400-04, 417). They looked through a window and saw the blood on the kitchen floor. Tom kicked open a door to the garage. They saw more blood in the garage on a car's rear bumper. The door into the house from the garage was also locked. They went outside and used a phone from Anna's van to call 911. The 911 call was directed to the Michigan State Police. The police asked if they had a key to the Poldermans' house. Fred Lewis indicated that he had one at home and he and Tom went to retrieve it. They used that key to gain entry into the house. Once inside, they saw blood in the kitchen and blood on the stairway leading into the basement. From the top of the stairs Fred Lewis could see Sary Polderman's body with its face up and blood around her neck. He saw his wife's

-8-

body face up at the bottom of the stairs with a baseball bat next to it. He could see the lower part of Marinus Polderman's body and he was face down. There were no signs of life. Tom went down stairs and checked to see if his mother had a pulse and found none. Fred and Tom went back outside, called 911 for help, and related what they had discovered inside the house. (TT II, 404-09, 419). The jury heard the 911 recordings. (TT II, 411).

Fred Lewis testified that a .22 caliber rifle was missing from the Poldermans' home. (TT II, 410, 424). A witness indicated that she saw a gun case and garbage bags containing unknown contents being carried away from the Polderman's house. (TT III, 596-97). Police found two areas inside the home where fairly large amounts of cash had been hidden. The first was up in the rafters and the second was in a chair in the basement. (TT III, 562).

Petitioner's sister, Brandy Miller, testified. (TT III, 567, 569). She had originally been charged with felony murder, perjury, and home invasion. As part of her plea agreement, she agreed to plead guilty to second-degree murder, with further agreement regarding her sentence. (TT III, 568, 609, 673). Brandy Miller testified that in August 2000 she was living at petitioner's house in Kalamazoo along with Nicky Williams (petitioner's wife), Barb Williams (Nicky's mother), Jerome "Joe" Williams (Nicky's brother), and Ben Platt. Brandy Miller's boyfriend at that time was Richard Vendeville. (TT III, 569). Brandy testified that at petitioner's house on August 31, 2000, she and four others made a plan to break into the Poldermans' home and take cash. The others were petitioner, Joe Williams, Ben Platt, and Angela McConnell. (TT III, 570, 607). This

group traveled to the Poldermans' home using petitioner's truck and a Lincoln that was owned by Barb Williams, but used by her son, Joe Williams. (TT III, 571-72).

Brandy Miller described how she and Angela McConnell had feigned car trouble to gain entry into the Poldermans' residence. (TT III, 573). Mrs. Polderman, a small, old woman, let Brandy and Angela inside. (TT III, 576). The men in the group entered without permission. (TT III, 577).

Mr. Polderman then came out from another area of the house, confronted the men, and attempted to get them to leave. Brandy testified that petitioner or Joe Williams punched 93 year old Marinus Polderman in the chest. Mr. Polderman fell down, but when he got back up, he was hit again. Petitioner and Joe Williams took Mr. Polderman to another area of the house. The sounds of movement and wrestling around were audible from the kitchen area. Ben Platt was holding Mrs. Polderman and Brandy Miller and Angela McConnell were standing nearby. Petitioner and Joe Williams forced Mr. Polderman back to the kitchen area. The blows with their fists evolved into striking Mr. Polderman with a baseball bat. Brandy Miller testified that her group had been armed with the baseball bat, a tire iron, and knives. (TT III, 579-84, 655).

Petitioner and Joe Williams took Mr. Polderman into the basement. Ben Platt also went downstairs. Brittany and Angela tried to keep Mrs. Polderman from going downstairs. They claimed that Mrs. Polderman somehow slipped past them and fell down the stairs. (TT III, 587-88, 658-59). Brandy testified that she saw all three men hitting Mr. Polderman. Joe then went and hit Mrs. Polderman and knocked her down. Petitioner then cut her throat. (TT III, 589-91).

Anna Lewis arrived on the scene.  She grabbed the bag of groceries from her van and asked Brandy and Angela who they were.  Brandy and Angela stuck to the story that they had car trouble.  They followed Mrs. Lewis into her parents' home.  (TT III, 590).  Mrs. Lewis saw the blood in the kitchen and started calling out to her parents.  When Anna Lewis reached the top of the stairs, Angela McConnell hit her more than once on the head with a tire iron.  (TT III, 592-93, 661, 665).

Brandy Miller indicated that after her group left the Polderman residence they took showers at petitioner's home and burned their blood soaked clothes to destroy the evidence.  The seat cover in petitioner's truck was also removed and burned.  (TT III, 601-03, 665-66).

Like Brandy Miller, Angela McConnell had entered into a plea agreement.  She had testified under oath at petitioner's preliminary examination.  She was unavailable at the time of petitioner's trial.  (TT I, 4-7).  The prosecutor and defense counsel read their questions from the preliminary examination[1] and another individual read the responses that Ms. McConnell had provided under oath.  (TT IV, 691-92).

Ms. McConnell's testimony was largely duplicative of that provided by petitioner's sister.  McConnell indicated that the plan had been to take money from the Poldermans.  She agreed that the group that went to rob the Poldermans' home on the date in question was comprised of herself, petitioner, Brandy Miller, Ben Platt, and Joe Williams.  She indicated that the group traveled in petitioner's truck and the Lincoln.  The plan was to have the girls go to the door and pretend that they were having car trouble.  (TT IV, 695-

---

[1]Petitioner's attorney also read the questions that had been posed to Ms. McConnell by an attorney for another defendant.

99).  Angela indicated that Mr. Polderman was taken downstairs by petitioner and Joe and she heard sounds like someone receiving blows and then trying to catch his breath. She also heard someone asking for the key to a safe. (TT IV, 703-04).  Mrs. Polderman was trying to get downstairs and Angela and Brandy were trying to stop her.  McConnell testified that Mrs. Polderman got past them and fell down the stairs.  (TT IV, 706).

Ms. McConnell testified that Anna Lewis arrived in her van and was carrying groceries into the house.  Anna was calling out for her parents and headed for the basement.  McConnell testified that she hit Anna Lewis in the head with a pipe.  When Mrs. Lewis tried to get up, petitioner stabbed her in the chest.  McConnell testified that she saw money that had been taken from the house.  (TT IV, 707-17).  She described taking of showers after the murders and burning clothes to destroy the evidence. (TT IV, 717-20, 789).  Angela McConnell was subjected to extensive cross-examination.  (TT IV, 727-86, 790-95).

On March 18, 2008, Ms. McConnell wrote a letter attempting to undermine her preliminary examination testimony.  She claimed that detectives had spoon-fed her the lies that she told.  (TT V, 849-51).

Detective Richard Mattison testified that petitioner was summoned for two investigative subpoena hearings during the investigation of the three murders.  During these hearings petitioner denied involvement in the murders.  Petitioner later admitted involvement.  In addition, during the second hearing defendant acknowledged that he lied about his pickup truck at the first hearing.  (TT V, 838-43, 848).

Detectives testified regarding the statements that petitioner gave to the police on March 13, 14, and 15, 2007.  The jury heard and saw excerpts of interview recordings.

-12-

(TT V, 857-68, 883, 915).  On March 13, 2007, petitioner admitted that on the date of the murders, he had been at the Poldermans' property.  (TT V, 929).  Petitioner's written statement was admitted into evidence.  (TT V, 930-31).  Petitioner indicated that he was at the Poldermans' property with Joe Williams, Angela McConnell, Ben Platt, and Brandy Miller.  Petitioner claimed that he left the scene before anyone entered the house.  He reported that he went back to the Poldermans' house with Joe Williams and Ben Platt with cleaning supplies to wipe fingerprints and destroy other evidence.  Joe Williams purportedly expressed concern that an Amerilink bag that he had left behind at the scene could be traced back to petitioner.  Petitioner claimed that Joe Williams and Ben Platt took care of everything inside the house while he remained outside in the car. (TT V, 932-35, 968-69).

On March 14, 2007, there was a one half hour interview.  Petitioner imposed this time limit.  Petitioner indicated that he had dropped his daughter off at driver's training and had to leave.  (TT V, 938).  During this very brief interview petitioner added more details about being at the Poldermans' residence on the date of the murders.  Petitioner "started right off by saying that he recalled driving out there and more specifically recalled that a van drove into the driveway, it would have been the van Anna Lewis had driven[.]" (TT V, 939).  He saw his sister trying to stop Mrs. Lewis from entering the house.  (TT V, 941).  Petitioner also admitted that he had been inside the Poldermans' house.  (TT V, 940, 962).  He mentioned that the girls used the ruse of car trouble to gain entry.  (TT V, 941).  On March 14, 2007, petitioner was allowed to return home.  Later that night, he contacted the police and asked to meet them.  He was advised that a meeting on March 15, 2007, would be preferable.  (TT V, 942).

On March 15, 2007, petitioner gave additional statements. At or near the conclusion of the this interview, petitioner denied ever being at the Poldermans' house. (TT V, 980, 987).

Nathan McDaniel testified that he had been an inmate at the Kalamazoo County Jail. McDaniel testified that petitioner related that he was involved in the murders of three people with Brandy Miller, Angela McConnell, Joe Williams, and a fifth person whose name he could not remember, but indicated that the fifth individual was a male. Petitioner indicated that they had taken a .22 caliber rifle. Petitioner took it to a duplex in Galesburg that his father owned. He took the rifle out behind the duplex and threw it in the river. (TT IV, 809-16). Other witness testimony established that petitioner's father owned such a duplex adjacent to the Kalamazoo River. (TT V, 982-83).

On May 22, 2008, the attorney's delivered their closing arguments (TT VI, 1031-59) and Judge Lightvoet delivered the jury instructions (TT VI, 1059-84). Later that afternoon, the jury returned its verdict convicting petitioner on all five counts. (TT VI, 1090-93). Judge Lightvoet sentenced petitioner on June 30, 2008. (Sentencing Transcript at 9, ECF No. 22; Judgment of Sentence Commitment to Corrections Department, ECF No. 1-2, PageID.61-62).

## B.   Subsequent Proceedings

Petitioner pursued an appeal in the Michigan Court of Appeals. The three grounds that petitioner is raising in his habeas corpus petition were included among the issues that he raised on direct appeal. (Defendant-Appellant's Brief at 2, Statement of Issues, ECF No. 1-2, PageID.16). On April 22, 2010, the Michigan Court

of Appeals issued its decision affirming petitioner's convictions and sentence. (Petition, Exhibit C, ECF No. 1-3, PageID.66-72; *People v. Miller*, No. 286580, 2010 WL 1629084 (Mich. Ct. App. Apr. 22, 2010)).

Petitioner filed an application for leave to appeal in Michigan's highest court. (Petition, Exhibit D, ECF No. 1-4, PageID.74-127). On February 7, 2011, the Michigan Supreme Court denied petitioner's application for leave to appeal. (2/7/11 Order, ECF No. 24; Petition, Exhibit E, ECF No. 1-5, PageID.140).

On February 6, 2012, petitioner filed his petition for federal habeas corpus relief. (Petition, ECF No. 1).

## Discussion

### I.  Confrontation Clause

In Ground I, petitioner asserts that his right to confront witness Angela McConnell was violated where the prosecutor introduced her preliminary examination testimony after she withdrew her agreement to testify and recanted her testimony, denying him an opportunity to cross-examine her. (Petitioner's Brief at 16-25, ECF No. 2, PageID.158-67).

The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.'  [The Supreme Court has] held that this bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42 (2004).  In *Crawford*, the Supreme Court divided out-of-court statements into two categories:  those that are "testimonial" and those that are not. *Id.* at 50-69.  The

Court identified testimonial hearsay as the "primary" concern of the Confrontation Clause. *Id.* at 53. Testimonial out-of-court statements by a witness is barred under the Confrontation Clause, unless (1) the witness was unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable. *Id.* at 68.

Petitioner's reliance on the Supreme Court's pre-*Crawford* and pre-AEDPA decision in *Barber v. Page*, 390 U.S. 719 (1968) is misplaced. (*See* Petitioner's Brief at 18-20, ECF No. 2, PageID.160-62). In *Barber*, the Supreme Court held that there was a violation of the Confrontation Clause because the prosecution "made no [] effort" to obtain the witness's presence at trial. Thus, there was no basis for finding that the witness was "unavailable" for purposes of the exception to the Confrontation Clause. *Id.* at 722-25. Petitioner concedes that Angela McConnell's invocation of her Fifth Amendment rights at the beginning of petitioner's trial "rendered her 'unavailable' for purposes of the *Crawford* rule." (Petitioner's Brief at 16-17, ECF No. 2, PageID.158-59). Further, in its subsequent decision in *California v. Green*, 399 U.S. 149 (1970), the Supreme Court held that there was no Confrontation Clause violation where the witness gave prior testimony at the defendant's preliminary examination and was subject to cross-examination by the defendant's attorney. *Id.* at 151, 158-68.

The Michigan Court of Appeals applied the *Crawford* standard and rejected petitioner's Confrontation Clause argument, finding that he had had an opportunity to effectively cross-examine McConnell during the preliminary hearing. (*People v. Miller*, 2010 WL 1629084, at * 1-2).

The Sixth Circuit recognizes that a habeas corpus petitioner faces a decidedly uphill battle where, as here, the state court has rejected the petitioner's Confrontation Clause argument based on the petitioner's claim that there was not an adequate opportunity for cross-examination of the witness at the preliminary examination. "If there is room for reasonable debate on the issue, the state court's decision to align itself with one side of the argument is necessarily beyond this court's power to remedy under § 2254, even if it turns out to be wrong." *Williams v. Bauman*, 759 F.3d 630, 636 (6th Cir. 2014); *see Al-Timimi v Jackson*, 379 F. App'x 435, 437-39 (6th Cir. 2010); *accord Jones v. Winn*, No. 4:15-cv-12239, 2016 WL 6432696, at * 5 (E.D. Mich. Oct. 31, 2016) ("Because there is 'no clearly established [F]ederal law' within the meaning of § 2254(d)(1) contradicting the finding of the state court that cross examination during a preliminary examination hearing satisfies the requirement of *Crawford*, the court must deny habeas relief on this claim."); *Rodriguez v. Howes*, No. 1:12-cv-159, 2016 WL 4697837, at * 15-16 (W.D. Mich. Sept. 8, 2016); *Hurick v. Woods,* No. 2:14-cv-81, 2016 WL 1127971, at * 5 (W.D. Mich. Mar. 23, 2016) ("[P]etitioner 'has failed to identify any Supreme Court precedent supporting his contention that his opportunity to cross-examine [the witness] at his own preliminary hearing was inadequate to satisfy the rigors of the Confrontation Clause' " (quoting *Bauman*, 759 F.3d at 635)).

I find that Ground I does not provide a basis for federal habeas corpus relief. Petitioner has not shown that the decision of the Michigan Court of Appeals rejecting Ground I "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or

"was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

## II.     Statements to Police

Ground II is petitioner's argument that his statements to law enforcement officers should not have been admitted because (1) they were obtained in violation of his due process rights, and (2) the statements were not voluntarily made.  (Petitioner's Brief at 25-31, ECF No. 2, PageID.167-73).  Petitioner argues that his statements to the police should have been excluded because police violated his due process rights by failing to arrest him on March 13, 2007, on a separate criminal charge.  The case petitioner cites in support of this argument is the Sixth Circuit's decision in *United States v. Kuehne*, 574 F.3d 667 (6th Cir. 2009).  (Petitioner's Brief at 27, ECF No. 2, PageID.169).

This case does not and cannot satisfy petitioner's burden under 28 U.S.C. § 2254(d).  *Kuehne* involved a direct appeal of federal criminal convictions and the Sixth Circuit affirmed those convictions, finding no error, much less error of constitutional dimensions.  The Sixth Circuit panel noted:  "We have not identified a case that suggests that joint interviews of suspects constitutes a violation of due process, nor has Kuehne directed this court's attention to any such case."  547 F.3d at 694.  Petitioner's more fundamental problem is that, even assuming that the Sixth Circuit's decision had offered some support for his argument, it cannot provide a basis for federal habeas corpus relief.  "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' " and "[i]t therefore

cannot form the basis for habeas relief under AEDPA." *Hill v. Curtin*, 792 F.3d at 677

(quoting *Parker v. Matthews*, 132 S. Ct. at 2155).

The Michigan Court of Appeals rejected petitioner's argument for lack of merit.

Petitioner's statements were not obtained in violation of his due process rights.

> Specifically, defendant argues that the police violated his due process rights when they waited two days after a warrant was issued on an unrelated weapons charge to arrest him. Before and after the warrant was issued, defendant voluntarily appeared at the police department and made incriminating statements. Defendant argues that the statements were involuntary and obtained in violation of his due process rights.
>
> * * *
>
> [W]e conclude that law enforcement did not deprive defendant of his due process rights when defendant was arrested on the unrelated weapons charge two days after the warrant was issued. "Michigan applies a balancing test to determine if a prearrest delay requires reversing a defendant's conviction because the state may have an interest in delaying a prosecution that conflicts with a defendant's interest in a prompt adjudication of the case." *People v. Cain*, 238 Mich.App. 95, 108-109, 605 N.W.2d 28 (1999). A defendant must first show that the prearrest delay resulted in prejudice. *Id.* Defendant must show "actual and substantial" prejudice that "meaningfully impaired his ability to defend the charge and, as a result, the disposition of the criminal proceeding was likely affected." *Id.* at 110, 605 N.W.2d 28 (quotations omitted). Here, defendant has failed to show that any delay in relation to his arrest on the unrelated weapons charge amounted to "actual and substantial" prejudice in this proceeding. *Cain*, 238 Mich.App. at 110, 605 N.W.2d 28. Defendant's statements to the contrary are self-serving and speculative.

(*People v. Miller*, 2010 WL 1629084, at * 2). Petitioner has not shown that the decision

of the Michigan Court of Appeals rejecting his due process claim "was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States" or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d).

There is no developed argument in petitioner's brief corresponding to his assertion that his statements to the police "were not voluntarily made." (Petitioner's Brief at 25, ECF No. 2, PageID.167). The issue should be deemed waived. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

Even assuming that this issue had not been waived, it does not provide a basis for federal habeas corpus relief. Michigan's courts found that petitioner's statements to the police were voluntary:

> The record indicates that at the time defendant made the incriminating statements he was 31 years old, had a high-school diploma, and had prior encounters with police. The police interviews took place over a three-day period and the longest interview session lasted nine hours. Defendant voluntarily appeared at all three interviews before he was arrested. In fact, he initiated two of the interviews. He was not in custody, he was permitted to take breaks and leave whenever he wanted. Police provided defendant with food, drinks, cigarettes, access to a restroom, and anything else he wanted. Defendant was not threatened or promised anything and no force was used against him. Defendant was not under the influence of drugs, alcohol, or any other intoxicants, and he was not sick or in need of medical attention. Although defendant stated that his hands were shaking because he recently quit drinking alcohol, defendant also stated that the symptom was not severe, and the interviewing officers testified that the symptom did not affect defendant's ability to make decisions. In sum, the trial court did not violate defendant's constitutional rights when it admitted statements he made to police. *Cipriano*, 431 Mich. at 339, 429 N.W.2d 781.

(*People v. Miller*, 2010 WL 1629084, at * 2-3).

Based upon the totality of the circumstances, it was objectively reasonable for Michigan's courts to hold that petitioner's statements were voluntary. *See Clement v.*

*Kelly*, 642 F. App'x 498, 501-05 (6th Cir. 2016); *Lewis v. Curtin*, 632 F. App'x 788, 794 (6th Cir. 2015). I find that the decisions of Michigan's courts rejecting all the arguments found in Ground II for lack of merit easily withstand scrutiny under 28 U.S.C. § 2254(d).

## III. Sufficiency of the Evidence

In Ground III, petitioner argues that the evidence presented at trial was insufficient to support the jury's verdict. (Petitioner's Brief at 31-39, ECF No. 2, PageID.173-81). Petitioner invokes his arguments with respect to Ground I and II (*Id.* at 33, 38, PageID.175, 180), which have already been addressed and rejected herein. Petitioner devotes most of Section III of his brief to attacks on Brandy Miller's credibility. (*Id.* at 34-39, PageID.176-181).

A section 2254 challenge to the sufficiency of evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.*; *see Cavazos v. Smith*, 132 S. Ct. 2, 3-4 (2011) (*per curiam* ) (*Jackson v. Virginia* "makes clear that it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial."). Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02

(1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n. 16; *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011).

The Michigan Court of Appeals ruled directly on this claim. Review of this issue must be conducted under the AEDPA standard, which the Sixth Circuit has described as "very deferential." *Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007). Review of challenges to the sufficiency of evidence under the *Jackson v. Virginia* standard proceeds under the "unreasonable application" prong of AEDPA. *See Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008). Such an argument is properly understood as an allegation that the state court's decision resulted in an unreasonable application of *Jackson v. Virginia. See Eady v. Morgan*, 515 F.3d 587, 601-02 (6th Cir. 2008). Review in such cases "is limited to determining whether the evidence was so overwhelmingly in favor of the petitioner that it compelled a verdict in his or her favor." *Thompson v. Bock*, 215 F. App'x 431, 436 (6th Cir. 2007). This standard presents a "nearly insurmountable hurdle" for the habeas petitioner. *Davis v. Lafler*, 658 F.3d at 534. "Adding to this extremely high bar are the stringent and limiting standards of AEDPA." *Id.*

The Sixth Circuit has summarized the "double layer of deference" given the state-court decisions in the context of sufficiency-of-the-evidence claims:

> First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See*

> *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979).  In doing so, we do not re-weigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury.  *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).  Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution.  Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable.

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

The Michigan Court of Appeals held that the evidence at trial was sufficient to support the jury's verdict finding petitioner guilty of of all counts of conviction.  (*See People v. Miller*, 2010 WL 1629084, at *4-5).  Habeas corpus review does not involve re-weighing the evidence, re-evaluating the credibility of witnesses, or substituting this Court's judgment for that of the jury.  *See Johnson v. Mitchell*, 585 F.3d 923, 931 (6th Cir. 2009).  The Michigan Court of Appeals articulated the appropriate standard under *Jackson v. Virginia*, citing state cases adopting this standard.  (*See People v. Miller*, 2010 WL 1629084, at *3 (citing, *inter alia*, *People v. Johnson*, 460 Mich. 720, 722-23, 597 N.W.2d 73 (1999)).

A rational fact-finder could easily find that the evidence presented was sufficient to find petitioner guilty beyond a reasonable doubt of the crimes of perjury, first-degree home invasion, and three counts of felony murder.  The decision of the Michigan Court of Appeals rejecting petitioner's challenges to the sufficiency of the evidence supporting his criminal convictions easily withstands scrutiny under the double layers of deference to which it is entitled under AEDPA.

-23-

## IV. Certificate of Appealability

Should the Court deny the petition, it must determine whether a certificate of appealability should be granted. 28 U.S.C. § 2253(c)(2). A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 529 U.S. at 484. "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of petitioner's claims. *Id.*

Examining petitioner's claims under the standard in *Slack*, reasonable jurists would not conclude this Court's assessment of petitioner's claims to be debatable or wrong. Accordingly, I recommend that the Court deny petitioner a certificate of appealability.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied on its merits.

Dated:  November 11, 2016        /s/  Phillip J. Green_____
                                 United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).